## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 15 2018, 5:24 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rebecca M. Eimerman
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of B.W., Minor Child, and A.T., Mother,

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

May 15, 2018

Court of Appeals Case No.
32A01-1709-JT-2041

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No.
32D03-1608-JT-8

**Brown, Judge.**

[1] A.T. ("Mother") appeals the involuntary termination of her parental rights with respect to B.W.[1] Mother raises two issues which we restate as whether the trial court erred in terminating her parental rights. We affirm.

## Facts and Procedural History

[2] On April 14, 2015, the Indiana Department of Child Services ("DCS") filed a verified petition alleging that B.W., born November 5, 2012, was a child in need of services ("CHINS"). The petition stated that B.W. had been removed from his parent, guardian, or custodian and that, prior to removal, he was residing with M.W. ("Father"), Mother, paternal grandmother ("Grandmother"), and paternal grandmother's boyfriend ("R.P."). The petition also stated:

   a. On April 9, 2015, DCS received a report alleging [B.W.] was a victim of neglect. The report alleged [Mother] had overdosed on heroin five weeks ago and was currently hospitalized, that [Father], [Grandmother], and [R.P.] are using heroin, and that [Father] was incarcerated two days prior and is currently in the Hendricks County Jail.

   b. On April 13, 2015, Family Case Manager Dawn Owens (FCM Owens) met with [Grandmother], [R.P.], and [B.W.] in the home.

   c. FCM Owens observed [R.P.] to be under the influence as his limbs were severely jerking to the extent he was having difficulty standing and speaking clearly.

---

[1] The court also terminated the parental rights of B.W.'s father, and B.W.'s father does not appeal the termination of his parental rights as to B.W.

d. [Grandmother] stated she knew [Mother] and [Father] were using drugs and had seen them under the influence of methamphetamine while caring for [B.W.].

e. [Grandmother] admitted to smoking marijuana while caring for [B.W.].

f. [R.P.] admitted to using methamphetamine one or two times a day and then caring for [B.W.] while under the influence.

g. On April 13, 2015, FCM Owens spoke with [Father] at the Hendricks County Jail. . . .

* * * * *

i. Father stated [Mother] had been using methamphetamine for two or three months prior to being admitted to the hospital.

j. Father stated [R.P.] also uses methamphetamine. Father stated [Grandmother] uses methamphetamine and Xanax.

k. Father stated he would care for [B.W.] while under the influence of methamphetamine.

l. On April 13, 2015, FCM Owens spoke with [Mother] at St. Vincent Hospital. Mother stated she had been hospitalized for six weeks. Mother stated she had blood clots in her lungs, endocarditis, was severely dehydrated, had pneumonia, and kidney failure when she was admitted to the hospital.

m. Mother stated her health problems could be a result of her past drug use but [she] did not admit to any drug use in the past nine months. Mother stated she has not used heroin in one year and she used methamphetamine one time nine months ago.

n. Mother stated she thought [Grandmother] only used marijuana.

Petitioner's Exhibit 1. On the same day, the court appointed guardian ad litem Suzanne Conger ("GAL Conger") to the case. After his removal, B.W. was placed with foster parents.

[3] On June 10 and 17, 2015, the trial court held hearings on the CHINS petition and adjudicated B.W. to be a CHINS, finding that his physical condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of Mother, that his mental condition was seriously endangered as a result of his exposure to domestic violence by Father on Mother, and that its coercive intervention was necessary because "Mother does not protect [B.W.] from the effect of Father's physical abuse of Mother and Father's serious drug abuse in [B.W.'s] presence." Appellant's Appendix Volume 2 at 22. The court also held that Mother was unlikely to meet B.W.'s needs, stating that "[a]lthough Mother has made by [sic] passing several random drug screens, and returning to work part[-]time[,] the evidence shows that [B.W.] would again be placed in danger if he was returned to Mother without services from DCS." *Id.* at 22-23.

[4] On August 5, 2015, the court issued both a dispositional order and a participation order. The first found that Mother tested positive for heroin based on a June 17, 2015 drug screen and ordered that B.W. remain in the current placement with supervision by DCS. The participation order required Mother to participate in random drug screens within twenty-four hours of DCS's request and in supervised visitation with B.W. as scheduled, complete

substance abuse, mental health, and domestic violence assessments, and follow all recommendations.[2]

[5] On November 18, 2015, the court held a periodic case review and found that Mother had "not complied with [B.W.'s] case plan," "not enhanced her ability to fulfill her parental obligations," and "not cooperated with DCS," and that the projected date for B.W.'s return home was "unknown due to parents [sic] failure to cooperate." Petitioner's Exhibit 9. The court additionally noted in its periodic case review order that Mother cancelled her parenting time on two different occasions, was at risk of being discharged from services with Lifeline as she has cancelled her appointments three times in November 2015, missed two sessions with Families First and was discharged on September 10, 2015, did not make two appointments and cancelled a third at Cummins Behavioral Health, and had tested positive for illegal substances for DCS, probation, and Cummins Behavioral Health. *Id.*

[6] On January 27, 2016, the court held another periodic case review, where it found that Mother had not complied with B.W.'s case plan, enhanced her ability to fulfill her parental obligation, or cooperated with DCS. The court further found that Mother missed a drug screen on November 17, 2015, tested positive for methamphetamine on November 4 and 11, 2015, had been referred for but not completed a domestic violence assessment, cancelled two visits in

---

[2] At the bottom, the participation order states "Distribution: . . . Counsel for [M]other." Petitioner's Exhibit 7.

November and one in December, missed several sessions with her caseworker to work on parenting skills, housing, and budgeting, and had "off and on" participation in part due to her incarceration for new criminal charges or probation violations. Petitioner's Exhibit 11.

[7] On March 23, 2016, the court held a permanency plan hearing, where it found that B.W., who had been residing at his placement in foster care for approximately eleven months, was progressing well and that Mother was:

> not in compliance with the plan as follows: Mother has been incarcerated in the Hendricks County Jail for this reporting period for battery charges. Prior to her incarceration, Mother was minimally compliant with services and appointments. Mother maintained employment and a steady legal income to provide for [B.W.]. Mother's last positive drug screen was for methamphetamine on November 4, 2015. Mother has not begun her domestic violence assessment.

Petitioner's Exhibit 13.[3]

[8] On April 1, 2016, Mother was released from jail in Hendricks County and appeared for a violation before a court in Floyd County that required her to complete twenty-eight days on house arrest, a period during which she moved in with her mother who lived in Floyd County. At some point following her release, she started having contact with B.W. by telephone. The phone calls

---

[3] Near the end of the order under the line that stated "[t]he permanency plan for [B.W.] . . . is hereby and continues to be approved by the court," the court checked boxes next to "reunification" and "adoption." Petitioner's Exhibit at 13.

occurred once a week and lasted three to five minutes. Home-based therapist Diane Boody began supervising the calls in May of 2016 because B.W. would refuse to talk to Mother, become distraught, cry, and turn his head away. After the calls, B.W. continued being agitated and would lack concentration in whatever therapeutic activity therapist Boody was conducting, or he would express happiness and be eager to start. In August 2016, Mother met with home-based mental health therapist Maryam Muhammad. On August 17, 2016, the court held a periodic case review and noted in its order that "Mother's therapist recommended Mother receive inpatient treatment for substance abuse" and "DCS made a referral for inpatient treatment but Mother hasn't complied." Petitioner's Exhibit 16.

[9] On August 31, 2016, DCS filed its verified petition for involuntary termination of Mother's parental rights. On November 2, 2016, the court held an initial hearing in Father's termination case and a review hearing in the CHINS case. Family case manager Andrea Hughes ("FCM Hughes") testified that B.W.'s behaviors of hitting, screaming, and acting out concerned DCS, that DCS had seen increases and decreases in his behaviors depending on whether Mother was having contact with him, and that, after communication between Mother and B.W., the foster placement and the therapist would report back a concern that B.W.'s behaviors increased. Therapist Boody indicated that B.W.'s behaviors were discussed at a child and family team meeting in October 2015, that Mother did not seem receptive to engaging in parenting education, and her referral for B.W. had stated that he "was having trouble transitioning from

visits with Mother back to his foster care location." *Id.* at 34, 38. She testified that it was her recommendation that phone contact between Mother and B.W. stop.

[10] On February 10, 2017, the court held a fact-finding hearing in Mother's termination case and heard testimony from licensed mental health counselor Alexandra Swackhamer that she never had an actual mental health therapy session with Mother and that Mother's discharge was unsuccessful "because the treatment objectives weren't met and she didn't follow through with counseling." *Id.* at 87. Addictions and outpatient therapist Denitra Taylor testified that she completed a substance abuse assessment of Mother and concluded that ongoing treatment was needed, she was not "able to get very far in [her] treatment" of Mother, she remembered Mother "having three consecutive absences, and that Mother was discharged unsuccessfully "[b]ecause . . . services were not complete." *Id.* at 98, 101. The court heard testimony from family consultant Sheryl Barnett who began supervising Mother's visits with B.W. in May 2015 who stated that Mother missed the last child and family team meeting. When asked how Mother responded when she offered advice to help deescalate situations during supervised visits, Barnett answered that Mother "tended to not – I mean I think she felt like it was her child and she didn't want to, you know, comply with what my suggestions on it would be." *Id.* at 115.

[11] When asked if Mother seemed willing to engage in services, therapist Muhammad testified that Mother was "defensive at first and a little guarded"

and that prior to their last session sometime during the week of February 1, 2017, they had often spoke about how Mother's ability to parent was affected by her substance use and "she typically reported that she did not believe that her parenting skills were affected by using the substances." *Id.* at 141, 150-151. She indicated that sometimes Mother denied she used drugs despite the positive drug screens and that her only explanation was that she "may have mistakenly taken her mom's medication because the bottles were not marked." *Id.* at 152. Therapist Ashley Cebe, who had administered a substance abuse assessment on January 10, 2017, testified Mother had told her that she used opiates prior to being clean for three or four weeks, that "she said she was using I think Suboxone," and that prior to the three or four weeks of being clean there had been a couple of short relapses. *Id.* at 169. Therapist Boody testified that Mother saying she loved B.W. "seemed to be like a trigger" causing him to "instantly leave the phone or react" and that Mother "said that [B.W.] understood what she meant when she said she loved him" and "she would continue each . . . phone call saying at the end I love you" despite Boody's suggestions to stick to "safer topics." *Id.* at 187. GAL Conger testified that, in certain child and family team meetings in which therapist Boody told Mother about some behaviors she saw in B.W., Mother was "a bit defensive and didn't really think that those were occurring" and was "pretty defensive that he doesn't do that with me." *Id.* at 234-235. GAL Conger stated her support DCS's request to terminate Mother and Father's parental rights because they have "had since April of 2015 when the . . . underlying CHINS case began to correct what needed to be done and now we're here at . . . 21 months." She

testified that she believed termination of Mother's parental rights was in B.W.'s best interest because "he came into the system when he was a little over two years old, two and a half, . . . and he's been with the same foster parents and he is being provided with consistency and routine at this point." *Id.*

[12] After the court admitted Mother's drug screens and results from Forensic Fluids, FCM Hughes was shown a copy of the notice from February 2, 2017, which "Mother signs when she consents to a drug screen," and testified that there was nothing written in the portion for listing the medications that she was prescribed. *Id.* at 215. B.W.'s foster mother testified that B.W. started exhibiting aggressive behaviors at some point after placement and that, sometime after Mother's visits completely stopped in January 2016, B.W. "did not appear as what I look at as afraid," "was able to relax more," and "was sleeping much better." *Id.* at 249. She testified that, when Mother started having telephone calls with B.W. again, the night terrors returned and he became more aggressive. Transcript Volume 3 at 4.

[13] Mother indicated that she did not have contact with Father anymore, she successfully completed domestic violence victim's counseling and thought it beneficial, and she chose to stay in Floyd County to "better [her] life and get with my mom." *Id.* at 43. She also testified that she "did miss a couple" of face-to-face visitations due to being sick over the course of the five or six months after being released from the hospital. *Id.* at 26. When asked what she felt about refraining from telling B.W. that she loves him, she replied, "I feel like I should be able to tell my son I love him because I don't feel like it harms

him." *Id.* at 33. She stated that between May and November 2016, she texted B.W.'s foster parents to ask how he was doing "mainly on holidays." *Id.* at 41. She did not recall making any collect phone calls from jail to his foster parents. To the question "[y]ou don't think that [B.W. is] actually exhibiting these behaviors," she responded, "I don't believe that – most of that – some of it's true honestly." *Id.* at 45.

[14] On August 15, 2017, the trial court granted DCS's petition for termination of Mother's parental rights. The order contained 105 very detailed findings which addressed Mother's parenting and drug use, the care and services provided to B.W. while Mother was in the hospital, B.W.'s needs, his exposure to drugs and domestic violence, and services ordered of Mother and her participation in them. Specifically, the order found:

> 19. [B.W.] exhibited very challenging behavior issues when he was removed from his parents. [B.W.] had great difficulty sleeping. [B.W.] couldn't sleep unless the lights in his room were on. [B.W.] would wake up multiple times a week screaming with nightmares. [B.W.] couldn't tell the foster parents what he was afraid of. At times, [B.W.] would just scream for no apparent reason. [B.W.] was very aggressive with anyone he came in contact with. [B.W.] would hit others including the children at his preschool/daycare. [B.W.] constantly licked his fingers. [B.W.] also had significant speech problems. When [B.W.] first went to foster care, he would just say the word "no". [B.W.'s] behavior is consistent with sustained exposure to traumatic events.

> 20. Foster parents and DCS got [B.W.] in First Steps and speech therapy. Initially [B.W.'s] speech level was so low that he couldn't be tested in some areas of speech.

21. [B.W.] did not know how to interact with other children. [B.W.] would go up to other children and just stand. He didn't know how to talk and/or ask to play with other children. [B.W.] would become aggressive with other children by hitting them.

22. During his critical first years, [B.W.] was exposed [to] several adverse childhood experiences (A.C.E.). His daily care was provided by individuals under the influence of drugs, . . . he was separated from his parents when they were arrested and in jail, he was separated from his mother while she was in the hospital for 8 weeks. [B.W.'s] physical and mental condition was seriously impaired or seriously endangered as a result of his parents['] inability, refusal or neglect to provide him with the necessary care, supervision and protection he needed. The [CHINS] Court specifically found his mental condition was seriously endangered as a result of his exposure to domestic violence by Father on Mother.

* * * * *

25. [B.W.] has been in therapy for over 14 months. During part of that time he was having in[-]person visits with Mother until she was arrested on new criminal charges and spent several months in jail. The in[-]person visits with Mother did not go well. Mother would focus on something she wanted [B.W.] to do and keep at him until he became frustrated. [B.W.] would run from Mother and she would chase him or [B.W.] would hit Mother.

* * * * *

27. After Mother was released from the Hendricks County Jail in April 2016[,] Mother went to Floyd County where she was on home detention. Mother had telephone visits with [B.W.]. . . . The telephone visits were stressful for [B.W.].

* * * * *

30. . . . [B.W.] needs consistency and predictability in his home life.

31. [B.W.] needs [a] secure, stable, long[-]term continuous relationship.

32. Mother has made some progress since she began working with [Muhammad] in August of 2016. Mother has completed a domestic violence assessment. Mother has started working on her own mental health issues and she has participated in sessions with [Muhammad] regularly. Mother has very recently addressed her substance abuse issues by going to a suboxone clinic.

33. However, Mother's recent and short period of sobriety does not outweigh her lengthy history of substance abuse.

* * * * *

35. Continuation of the parent-child relationship between [B.W.] and his Mother and Father is a serious threat to [B.W.'s] mental and emotional health and condition today and long[-]term.

36. Recently Mother has made progress. Mother has stable employment and stable housing. Mother is working toward sobriety. Mother successfully completed domestic violence counseling.

37. Mother wants to reunify with [B.W.]. However, Mother made the decision to relocate several hours away from where [B.W.] was placed. DCS's decision to keep [B.W.] placed with his original placement was reasonable. [B.W.] has serious behavior issues and placement has been responsive to [B.W.'s] needs. Mother's relocation to Floyd County made visitation with [B.W.] difficult. The Court gives more weight to Mother's prolonged failure to respond to services offered her than Mother's very recent progress.

38. Although Mother loves [B.W.] she does not have the current ability to meet [B.W.'s] emotional and mental health needs. It is not emotionally or mentally safe for [B.W.] to be in the care of Mother at this time. . . . The child needs permanency now.

* * * * *

40. [B.W.'s] needs outweigh Mothers' [sic] interest in preserving the parent-child relationship[].

* * * * *

58. Mother received a comprehensive assessment in June of 2015 with [Swackhamer] at Families First. Mother was referred for an assessment and counseling. Mother presented with symptoms of depression and anxiety. [Swackhamer] developed a Treatment plan for Mother to have individual weekly counseling to help Mother develop coping skills and alleviate her symptoms of anxiety and depression. Mother never followed up for appointments and was unsuccessfully discharged approximately 90 days later.

* * * * *

60. Mother had a dual diagnosis for substance abuse and mental health. Mother disclosed she was raped and her trauma triggered her substance use. Mother was not really committed to her treatment. Mother did not make much progress with [Taylor]. Mother missed appointments and later was arrested on new criminal charges . . . .

* * * * *

76. Mother has tested positive for illegal drugs on the following dates:

| | |
|---|---|
| 1-19-17 | buprenorphine |
| 11-28-16 | buprenorphine |
| 11-23-16 | buprenorphine |
| 11-9-16 | buprenorphine |

| 11-2-16 | buprenorphine |
| 10-12-16 | xanax |
| 8-17-16 | morphine and G-Acetylorphine |
| 6-23-16 | morphine and G-Acetylorphine |
| 8-28-15 | methamphetamine and amphetamine |
| 6-7-15 | morphine and G-Acetylorphine |
| 4-13-15 | oxycodone |

\* \* \* \* \*

80. [B.W] hasn't seen his Mother since January of 2016.

\* \* \* \* \*

97. DCS has proved by a clear and convincing evidence that there is a reasonable probability that [B.W.'s] emotional connection to Mother will not be remedied in a way that is emotionally and mentally healthy for [B.W.].

\* \* \* \* \*

102. Mother has had almost 22 months to address . . . her own trauma and learn how to meet [B.W.'s] needs. Mother does have employment and stable housing and may be able to meet [B.W.'s] physical needs. However, Mother cannot safely meet [B.W.'s] mental and emotional and behavioral needs and DCS has proved by clear and convincing evidence that there is a reasonable probability that Mother will not ever be able to meet [B.W.'s] mental and emotional needs.

*Id.* at 33-53. The order concluded that DCS proved by clear and convincing evidence that there is a reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied and that it is in the best interest of B.W. that Mother's parental rights be terminated.

## *Discussion*

The issue is whether the trial court erred in terminating Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[4] If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-

---

[4] Subsequently amended by Pub. L. No. 42-2017, § 2 (eff. July 1, 2017).

1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[17] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require*s the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a

case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[18] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of B.W. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[19] In determining whether the conditions that resulted in B.W.'s removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[20] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[21] Mother argues that insufficient evidence supports the trial court's conclusions that the conditions which resulted in B.W.'s removal and continued placement outside the home will not be remedied by her. Specifically, she contends that the evidence demonstrates she made significant progress in services and that the CHINS wardship should have continued until such time as B.W. was ready for contact and she had ample opportunity to prove that his placement out of the home was no longer necessary. She asserts that she and Father no longer had contact, that she successfully completed domestic violence counseling, she actively participated in individual counseling, and that there is no evidence that

her "health conditions perpetuate her ability to provide care for B.W." *Id.* at 15.

[22] DCS argues that Mother's admitted history of substance abuse was part of the reason for B.W.'s removal as shown in the unchallenged findings and that Mother "simply did not benefit from the services provided her," "had not equipped herself to understand or to address [B.W.'s] special needs and condition," and "[t]hus, . . . was not equipped to safely and properly provide for [B.W.'s] special needs, especially his emotional and mental health." Appellee's Brief at 30. DCS contends Mother engaged in only "half-measures" despite having access to services to improve her parental fitness since June 2015. *Id.* at 34. Specifically, it asserts that she failed to comply with her therapist's recommendation to receive "inpatient treatment for substance abuse," that B.W.'s therapist testified that Mother did not know how to communicate with him or understand the trauma he had experienced in parental care, that she blamed others for her failures, and that her visits began to decrease even before she was incarcerated for battery. *Id.* at 32 (quoting Transcript Volume 4 at 103).

[23] To the extent Mother does not challenge the court's findings, these unchallenged facts stand as proven. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681

N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, this Court accepted them as true).

[24] With respect to Mother's argument that CHINS wardship should have continued until she had an opportunity to prove that B.W.'s placement out of the home was no longer necessary, she fails to show how additional time, in and of itself, would be of assistance when she has already been afforded a significant period of time to fulfill the court's requirements. The record reveals that Mother minimally addressed her substance abuse from August 5, 2015, when the trial court issued its participation order, until February 10, 2017, when it held the termination hearing. During this period, she exceeded the permissible number of missed appointments with addictions and outpatient therapist Taylor and was discharged before successfully completing the services. She also failed to take responsibility for her substance abuse by blaming Father for her substance use, reporting that she believed her parenting skills were not affected by substance abuse, and alleging a mix-up with her mother's medication when she tested positive for controlled substances. Under these circumstances, we cannot say the trial court abused its discretion by discontinuing the CHINS wardship when it did. While we observe Mother's participation in a suboxone clinic, we note that the trial court is given discretion in balancing her very recent efforts at improvement against the habitual patterns of her conduct, in determining that the evidence of Mother's prior history is the best predictor of her future behavior, and in finding that "Mother's recent and short period of sobriety does not outweigh her lengthy [history] of substance

abuse." Appellant's Appendix Volume 2 at 40. *See In re E.M.*, 4 N.E.3d at 640 (noting that, although father's "eventual efforts to establish a relationship with his children were commendable," his efforts were "both too little in view of his violence and earlier pattern of hostility toward services, and too late in view of the children's urgent need for permanency after several years in out-of-home placement"). Considering Mother's unresolved substance abuse issues, together with the trial court's other findings, we conclude that clear and convincing evidence supports the court's determination that there is a reasonable probability that the conditions leading to B.W.'s removal will not be remedied. *See In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (holding that there was a reasonable probability that the conditions that led to the children's removal, including substance abuse, would not be remedied and noting that "while [the mother] remedied two of the conditions that led to the children's removal, there was no evidence that she would remedy her substance abuse," and "[e]ven though [father] attended a month of treatment at Aspire, he failed to attend the last eight weeks of his program, which caused Aspire to discharge him for non-attendance").

[25] While Mother does not argue that termination of her parental rights was not in B.W.'s best interests, we observe that GAL Conger testified in support of DCS's request for termination and stated that it was in B.W.'s best interests for Mother's rights to be terminated because B.W. was "being provided with consistency and routine at this point" after having come "into the system when he was a little over two years old" and the "underlying CHINS case began."

Transcript Volume 2 at 234-235. Our review of the evidence as set forth above and in the record, including Mother's history of substance abuse and multiple positive drug screens, Mother's refusal to implement parenting suggestions, and B.W.'s relationship with Mother and behaviors, reveals that the evidence supports the trial court's best interests determination.

## *Conclusion*

We conclude that the trial court did not err in terminating the parental rights of Mother.

Affirmed.

Baker, J., and Riley, J., concur.